Fred T. Hogan v. Commissioner. Novadean Hogan v. Commissioner. L. H. Choate v. Commissioner. Lucille Choate v. Commissioner. W. G. Choate v. Commissioner.
Hogan v. Commissioner
Docket Nos. 107630, 107631, 107886, 107887, 107888.
United States Tax Court
1942 Tax Ct. Memo LEXIS 53; 1 T.C.M. (CCH) 208; T.C.M. (RIA) 42646; December 9, 1942
*53 OPPER
Memorandum Findings of Fact and Opinion OPPER, J.: These consolidated proceedings challenge income tax deficiencies determined by respondent for the year 1938 as follows: Fred T. Hogan
$3,671.81
Novadean Hogan
12.21
L. H. Choate
632.85
Lucille Choate
632.85
W. G. Choate
2,015.58
The questions presented are (1) whether a transaction involving an oil and gas lease gave rise to capital gain or ordinary income, (2) the proper treatment for purposes of depreciation of the equipment on the lease, and (3) whether the taxable income arising out of the assignment of the lease and attributable to the interest of petitioner Fred T. Hogan is his separate income or community income to be divided between Fred T. Hogan and petitioner Novadean Hogan. Petitioners Fred T. Hogan and Novadean Hogan abandoned error charged with respect to gain arising from the sale of another lease by them. Findings of Fact All the stipulated facts are hereby found accordingly. From the evidence adduced at the hearing further facts are found and those facts in the following recital, which are not from the stipulation, are found from the evidence adduced at the hearing. Petitioners are all individuals. *54 Lucille Choate is the wife of L. H. Choate and during the years 1936, 1937, and 1938, they were living together in Texas as husband and wife. Novadean Hogan is the wife of Fred T. Hogan. With the exception of W. G. Choate, the Federal tax returns for each of the petitioners for the year 1936 were filed with the collector of internal revenue at Dallas, Texas. W. G. Choate's return for 1936 was filed with the collector of internal revenue at Oklahoma City, Oklahoma. On September 8, 1924, Mrs. N. L. Baker executed an oil and gas lease to C. A. Tunstill, covering, among other land, 230 acres located in Upton County, Texas. Under the terms of the lease the lessee had 10 years in which to produce oil or gas; on the production of oil or gas the term of the lease was to be 50 years from the date of its execution. The lessor retained the customary one-eighth royalty interest, and was entitled to receive delay rentals on the lessee's failure to begin drilling operations within 12 months from the date of the execution of the lease. On July 7, 1925, Tunstill assigned the lease to the Maryland Oil Company and on July 1, 1929, the lease became the property of the Continental Oil Company as the *55 result of a consolidation of the two companies. By an instrument dated December 3, 1936, the Continental Oil Company assigned to Roy R. Brown all its right, title, and interest in the lease in question "in so far as said lease covers and affects the oil, gas and casinghead gas, and the oil, gas and casinghead gas rights, at and above the depth of 2,750 feet from the surface in and under" the 230 acres. Brown assumed all the covenants of the original lease and further agreed that "as a part of the consideration for this assignment, the assignor shall receive, as an overriding royalty, one-sixteenth (1/16) of all the oil, gas or casinghead gas produced, saved and sold from the * * * land, from depths not exceeding 2750 feet from the surface." This lease will sometimes hereinafter be referred to as the Baker lease. On December 18, 1936, petitioners Fred T. Hogan and L. H. Choate acquired Brown's interest in the Baker lease by assignment for a consideration of $5,000, $2,500 of which was to be paid in cash and the remaining $2,500 was payable out of one-eighth of the thirteen-sixteenths of all oil produced and saved from the property if, as, and when produced. Fred T. Hogan and L. *56 H. Choate, in acquiring the interest in the Baker lease from Brown were acting for themselves and W. G. Choate. After acquiring the interest in the Baker lease Hogan and L. H. Choate proceeded to organize a partnership known as "Choate & Hogan" of Midland, Texas, to own, develop and operate the Baker lease. The profits and losses of the partnership were to be shared 50 per cent by Hogan and 50 per cent by L. H. Choate and W. G. Choate. In the conduct of the affairs of the partnership, Hogan had supervision of the geological work in connection with the drilling of the wells; he also attended to financial arrangements, the sales of oil produced from the lease and negotiated the sale of the lease itself. L. H. Choate was a drilling contractor who used his own equipment in drilling the wells on the lease. Hogan was dependent upon L. H. Choate for the drilling of the wells. This was the reason for the formation of this partnership. W. G. Choate was a partner of L. H. Choate and performed no services on the lease. In development and operating the Baker lease the partnership drilled six wells. In order to finance the drilling of the wells they obtained loans from the Mercantile National *57 Bank of Dallas, Texas, as follows: Due
Date
Description
Amount
6-15-37
Note #1, Baker Wells #1
and #2
$21,666.67
9-2-37
Note #3, Baker Well #3
11,000.00
10-7-37
Note #4, Baker Well #4
11,000.00
11-6-37
Note #5, Baker Well #5
11,000.00
12-4-37
Note #6, Baker Well #6
11,000.00
Total Principal Sum
$63,666.67
The agreement under which these loans were made provided that the indebtedness should be liquidated from an assignment of oil runs from the Baker lease and the indebtedness was paid therefrom to the extent of $36,256.30. The balance of the indebtedness of $65,666.67 was paid on August 22, 1938, not out of oil runs but, in effect, out of the proceeds received by the partnership from the conveyance of an interest in the Baker lease to the Sylva Oil Company, to be described presently. The Baker lease was owned and operated by the partnership until that conveyance which took place on August 22, 1938. On August 11, 1938, the partnership entered into a written contract covering the Baker lease to the McAlester Fuel Company in which the partnership was designated as "seller" and the McAlester Fuel Company as "buyer". Under the contract the partnership was to *58 execute and deliver an assignment of the lease to the McAlester Fuel Company and that company was to "buy" the lease from the partnership for a consideration of $110,000 in cash, to be paid upon delivery of a proper assignment of the lease to the McAlester Fuel Company. The partnership was "to except and reserve to themselves, their heirs and assigns, an overriding royalty of 1/8th of 8/8ths of all oil and gas produced" by the McAlester Fuel Company, its successor or assigns. The reservation was to be one-sixteenth in the name of L. H. Choate and one-sixteenth in the name of Hogan. By agreement between the parties the contract of purchase of the lease was to be carried out by execution of an instrument of conveyance to the Sylva Oil Company instead of to the McAlester Fuel Company. On August 22, 1938, the Sylva Oil Company notified L. H. Choate that it had purchased the lease "together with the producing oil wells thereon and the equipment of such wells, including the house on the lease". This letter further advised that it was understood that L. H. Choate had on the lease certain drilling equipment, pipe and a pick-up truck which it was Choate's privilege to remove since the Sylva *59 Oil Company was "only acquiring the personal property actually used and attached to such producing wells on the lease," and the above-mentioned house. On the same date, August 22, 1938, Choate & Hogan executed an instrument by which they did "bargain, sell, assign and convey" the Baker lease subject to all the terms of the instrument under which it was acquired by the partnership, all of its rights, title and interest in the property "together with all wells and the equipment thereof, including pumps, casings, piping, tanks, lease house, and all other personal property on or used in connection with said premises, including oil in storage, to Sylva Oil Company, a Texas corporation, its successors and assigns; save and except that assignor herein expressly reserve to themselves, their heirs and assigns, and do not assign or convey to the assignee herein, 1/8th of the 8/8ths of all oil and gas and casinghead gas which may be produced and saved by Sylva Oil Company its successors and assigns, from the aforesaid land at and above the depth of two thousand seven hundred fifty feet from the surface under and by virtue of the lease above mentioned, delivery of such part of oil, gas and casinghead *60 gas to be made free of cost to the assignors * * *; such reservation of overriding royalty or share of production to be 1/16th of the 8/8ths in favor of L. H. Choate, and 1/16th of the 8/8ths in favor of Fred T. Hgan." At the date of the transaction with Sylva Oil Company the interest in the Baker lease owned by Choate and Hogan consisted of thirteen-sixteenths of eight-eighths, the $2,500 oil payment reserved by Roy R. Brown having been paid out during March, 1938, and the cost, less depletion sustained, of this interest to the partnership was $23,583.78 on that date. On the date of the transaction the cost of the equipment on the lease, less depreciation sustained, was $23,090.60. After the assignment, Sylva Oil Company drilled and paid for four additional oil wells and operated the lease, and the parties otherwise conformed to the terms of the instrument. Neither the Choates nor Hogan understood that they had any rights as landlord. Sylva Oil Company certified and guaranteed to Humble Oil Company that effective 7:00 A.M. on August 15, 1938 (the effective date of the last transaction) it was the legal owner of a seven-eighths interest in the oil produced from the property covered *61 by the Baker lease subject to overriding royalties of one-sixteenth each to Continental, L. H. Choate and Hogan. Sylva Oil Company allocated the $110,000 purchase price as follows: Leasehold costs, $46,500; equipment of six wells, $24,000; additional equipment and gun barrel, $2,500; drilling cost of six wells, $36,000; dwelling on the lease, $1,000. It claimed depreciation on the cost thus allocated to equipment in its return for the year 1938 in the amount of $1,674.17 and in its income tax return for 1939 in the amount of $5,613.35 which amounts were allowed to it for those years as depreciation on the equipment by the Commissioner of Internal Revenue after an examination by his agent. Sylva Oil Company assessed the leasehold interest which it acquired and all the equipment thereon for ad valorem taxes in the State of Texas and County of Upton and paid the taxes based on such assessments. Sylva Oil Company also made all repairs and replacements to the equipment after August 22, 1938, and paid for all such repairs and replacements. The transaction involved was reported in the partnership return of Choate and Hogan for the year 1938 as a sale as follows: Leasehold
Equipment
Total
$98,454.70
$11,545.30
$110,000.00
Sale Price
Less Cost of Sale: Gross Cost
$33,391.80
$30,206.49
$ 63,598.29
Less - Reserves for
Depletion and Depreciation
9,808.02
7,115.89
16,923.91
Net Cost of Sale
$23,583.78
$23,090.60
$ 46,674.38
Gross Gain from Sale
$74,870.92
($11,545.30)
$ 63,325.62
Less Commission Paid
3,000.00
3,000.00
Net Gain from Sale
$71,870.92
($11,545.30)
$ 60,325.62
Taxable Gain from Sale
(Sec. 117, Revenue Act of 1938)
$47,913.95
($11,545.30)
$ 36,368.65
*62 The loss of $11,545.30 as above computed on the sale of equipment was reported as an ordinary loss. The net gain from the sale of the leasehold of $71,870.92 was reported as a long-term capital gain, under section 117, Revenue Act of 1938, taxable to the extent of $47,913.95. The above gain of $47,913.95 and loss of $11,545.30 were reported in the individual returns of the partners as follows: Gain
Loss
Fred T. Hogan
1/2
$23,956.98
$ 5,772.65
Novadean Hogan
None
None
L. H. Choate
1/8
5,989.24
1,443.16
Lucille Choate
1/8
5,989.24
1,443.16
W. G. Choate
1/4
11,978.49
2,836.33
$47,913.95
$11,545.30
In his notice of deficiency respondent determined that the partnership did not make a sale of the Baker lease but held that the transaction constituted a sublease, the consideration of $110,000 being a bonus. Respondent computed the gain on the transaction as follows: Oil Income
$110,000.00
LESS - Depletion
$30,250.00
Commissions
3,000.00
33,250.00
$76,750.00
Fred T. Hogan and Novadean Hogan were married in Arizona on September 6, 1937, and from the date to the present time have lived together as husband and wife in Texas. At the *63 time of their marriage three wells had been drilled by the partnership on the lease and prior to the time the lease was sold to the Sylva Oil Company three additional wells were drilled. As heretofore indicated, Hogan did the geological work together with general management and arranged for financing and for the ultimate sale of the lease. Prior to their marriage Novadean Hogan worked for the partnership in its office at Midland, Texas. She handled the correspondence and prepared monthly reports required by the railroad commission and others. She performed the general office work in connection with the acquisition, development and operation of the lease by the partnership. After their marriage she continued to perform these duties and was paid a salary by the partnership. She also did work for L. H. Choate in connection with drilling for outsiders for which she was not paid any additional salary. The cost of the wells incurred by the partnership allocated to the periods before and after marriage were as follows: Before marriage
$25,762.03
After marriage
39,141.80
Total
$64,903.83
Runs from the Baker lease were to be paid over to the bank and applied on the indebtedness. *64 An assignment of such oil runs was given by the partnership to the bank. The oil runs from the lease used to apply on the indebtedness, segregated between production before and after marriage were as follows: Before marriage
$ 1,056.85
After marriage
35,199.45
Total
$36,256.30
Total production from the interest in the Baker lease owned by the partnership during the period of ownership amounted to $39,265.50, being $4,066.05 from production before the marriage and $35,199.45 after the marriage. Opinion That petitioners were not entitled to treat the transfer of an interest in these leases as a sale, but must look to depletion for the return of their capital, is sufficiently clear to require but little demonstration. Where a royalty interest is retained, as was the case here, the principle of recovery by depletion rather than by treatment as a sale applies to all receipts, including any cash bonus which is regarded as in the nature of advance royalties. Cullen v. Commissioner, (C.C.A., 5th Cir.), 118 Fed. (2d) 651McLean v. Commissioner, (C.C.A., 5th Cir.), 120 Fed. (2d) 942. The authority of these cases has *65 not been weakened by Lee v. Commissioner, (C.C.A., 5th Cir.), 126 Fed. (2d) 825 Its effect was merely to repudiate the distinction originally drawn in Commissioner v. Laird, (C.C.A., 5th Cir.), 91 Fed. (2d) 498, between royalty and oil-payment cases as to recovery of initial cost. If this were an oil payment case which it is not, and if the Lee case had not been decided, petitioners might be in a position to seek to limit the taxability of the cash received to the excess over their original investment on the theory of the Laird case. Cf. Columbia Oil and Gas Co. v. Commissioner, (C.C.A., 5th Cir.), 118 Fed. (2d) 459. But we are at a loss to see that petitioners can take any comfort from the Lee case under the circumstances existing here. This issue is decided for respondent. What gives us the greatest difficulty is a sentence in Cullen v. Commissioner, supra, to the effect that "the cost of equipment * * * may be recovered by percentage depletion allowance." It is by no means clear that the court intended there to hold that tangible physical *66 equipment used in the operation of leases transferred upon a retained royalty was subject to recovery through depletion rather than through depreciation on the one hand or from the proceeds of the sale on the other. Even, however, if that were the intention, the present facts are distinguishable from those in the Cullen case. The contracts there made no mention of the physical equipment, and it might have been assumed that the transferor intended to retain the tangible property or an interest therein, at least to the same extent as with respect to the oil itself. Here the assignment not only contained specific reference to the tangible equipment but seems to require the construction that all of petitioner's interest for all time and for all purposes was thereby transferred to the assignee. Cf. Columbia Oil and Gas Co. v. Commissioner, supra. If that is the proper construction of the contract, petitioner would have no further claim to depreciation on the equipment, cf. Regulations 101, Article 23, (a) 18, and its unrecovered cost could be secured only by allocating to the equipment some portion of the purchase price, which the petitioners here *67 seem to have done or, in the alternative, by deducting the difference as a loss. Without being assured as to the meaning of the quotation from the Cullen case, we are nevertheless satisfied that it is in any event inapplicable here, and conclude that petitioners are entitled to an allowance for the unrecovered cost of the equipment transferred. The final issue with respect to petitioner, Fred T. Hogan, involves the claim that the proceeds of the assignment were community income. The leases in question were acquired prior to his marriage, and it must be recognized that ordinarily the proceeds of such a transaction as we have here would be regarded as an increase in lands owned by petitioner prior to his marriage, and hence his separate income. Commissioner v. Wilson, (C.C.A., 5th Cir.), 76 Fed. (2d) 766; Turbeville v. Commissioner, (C.C.A., 5th Cir.), 84 Fed. (2d) 307. It is asserted, however, that in this instance the profit was made possible by the intermediate development of the oil property which took place to a preponderant extent subsequent to the marriage; and further, that some of the income from the lease, *68 admittedly belonging to the community, was used to finance such development. We are not convinced that either consideration is sufficient to authorize an exception in this case. The interest which was transferred and for which the payment was received was in the leases themselves. It was not compensation for services of the husband. Nor is it clear that his personal activities in designating the location of the wells, as distinguished from the actual drilling which was performed by others, added materially to the value of the property. See Commissioner v. Turbeville, supra. And certainly, the use of community funds with or without the approval of the wife could do no more than possibly create an indebtedness. None of the considerations advanced by petitioner were sufficient to transform separate property into community income. E. Michua, 24 B.T.A. 715. Decision will be entered under Rule 50.